UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

       Plaintiff,

   vs.               REPORT AND RECOMMENDATION

Jeffrey Lee Oliver,

       Defendants.      Crim. No. 06-124 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Jeffrey Lee Oliver:

      1.    The Defendant's Motion to Suppress Evidence from Search.

      2.    The Defendant's Motion to Suppress Statements.

A Hearing on the Motions was conducted on May 16, 2006, at which time, the Defendant appeared personally, and by Craig S. Hunter, Esq.; and the Government appeared by John Vaudreuil, Assistant United States Attorney.

For reasons which follow, we recommend that each of the Defendant's Motions be denied.

## II.  Factual Background

The Defendant has been charged with one Count of possession of a firearm by a felon, in violation of Title 18 U.S.C. §§922(g)(1) and 924(a)(2).  The alleged offense is said to have occurred on or about February 28, 2006, in this State and District.  As pertinent to the charges, and to the Motions now before us, the operative facts may be briefly summarized.[1]

At the Hearing, Michael Engum ("Engum"), who is an officer with the Minnesota State Highway Patrol, testified at the instance of the Government, while the Defendant testified on his own behalf.  According to Engum, on February 28, 2006, at approximately 11:45 o'clock p.m., he was patrolling the area near Bemidji,

---

[1]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

- 2 -

Minnesota, when he observed a Ford Expedition vehicle traveling eastbound on U.S. Highway 2.  The vehicle did not have a rear license plate and, from the officer's vantage point, which was approximately one and one-half (1½) vehicle lengths from the rear of that vehicle, no temporary vehicle registration sticker was visible.  Engum, who was driving an unmarked vehicle, followed the vehicle as it exited from Highway 2 onto Highway 197.  Since Minnesota law requires the display of both front and rear license plates, see, <u>Minnesota Statutes Section 169.79, Subdivision 6</u>, or, where a vehicle is newly purchased, the display of a temporary registration sticker, which must be posted on the left side of the inside rear window of the vehicle, see, <u>Minnesota Statutes Section 168.092, Subdivision 1</u>, Engum decided to initiate a traffic stop of the Expedition.

Engum activated his emergency lights, which were located in the front window of his vehicle.  The driver of the Expedition did not stop, but continued his course of travel to a gas station, which was approximately 200 yards from the location where Engum had activated his lights.  Engum followed the Expedition into the gas station, and then approached the vehicle on foot.  Upon his approach, Engum observed the driver of the vehicle throw a set of keys onto the roof of the Expedition.  Engum testified that, in his experience, such behavior was highly unusual.  Engum also

observed a piece of paper in the upper left corner of the rear window of the Expedition. However, since the vehicle was equipped with tinted windows, Engum testified that he could not ascertain whether the piece of paper was a temporary registration sticker.

Engum proceeded to the front driver's side window of the Expedition, which was occupied by two adult men, one of whom was the Defendant, who was located in the front passenger seat. Engum informed the driver of the vehicle why he initiated the traffic stop, and he requested to see the driver's license. The driver produced an instructional permit, which authorizes an adult who does not have a driver's license to drive when he is accompanied by a licensed driver who is at least eighteen (18) years of age or, in the case of a minor, by a licensed driver who is at least twenty-one (21) years of age. Minnesota Statutes Section 171.05, Subdivisions 1 and 2. Engum proceeded to ask the Defendant whether he was in possession of a valid driver's license. The Defendant stated that he was not, but instead, he produced a tribal identification card which had been issued by the Red Lake Band of Chippewa Indians.

At some point during the encounter, Engum inquired as to whether the vehicle was registered, and as to why the driver had thrown his keys on top of the vehicle. Engum testified that he did not receive a response to his inquiry concerning the

vehicle's registration, but that a check of the Expedition's vehicle identification number revealed that it was not stolen, but that it was registered to a car dealership. Engum further testified that he could not remember the driver's stated reason for throwing his car keys.

Engum also testified that, during his initial encounter with the driver, the driver's hands were visibly shaking as he handed the officer his identification; that the Defendant appeared nervous and edgy; and that the Defendant did not make eye contact with Engum, but instead, he stared straight in front of himself. Engum testified that such behavior was also unusual when compared to behavior that he had observed during other traffic stops.

Once Engum determined that there was no licensed driver in the vehicle, he went back to his vehicle to arrange for a "custody tow," which he testified was the protocol for situations where none of the occupants of a stopped vehicle was a licensed driver. After completing some of the paperwork, Engum asked the driver to exit the vehicle, and he explained to the driver that he intended to have the vehicle towed. The driver advised Engum that his mother was on her way to pick up the vehicle, but Engum explained that he intended to follow protocol, which required that

the vehicle be towed.  The officer proceeded to conduct a pat-down search of the driver, who was then placed in the back seat of the Engum's vehicle.

After placing the driver in the back seat of his vehicle, Engum returned to the Expedition, where he advised the Defendant that the vehicle was going to be towed; that the items in the car would be inventoried; that he could not remain in the vehicle while it was being towed; and that Engum would give the Defendant a ride, if he so desired.  Engum testified that he was not required to give the Defendant a ride, but that it is a common practice for officers in the Bemidji area to transport residents of the Red Lake Indian Reservation to the boundary of Reservation, which is approximately twenty-two (22) miles from Bemidji, and then to contact tribal authorities, who would provide any further transportation.  Engum testified that the Defendant never stated whether he wanted to get a ride from the officer, but that, had the Defendant refused, he would not have compelled him to accept a ride.

After advising the Defendant that the Expedition would be towed, and inventoried, Engum asked the Defendant to exit the vehicle.  The Defendant opened the vehicle door, at which time Engum observed the Defendant fidgeting with the front pocket of the hooded sweatshirt that he was wearing.  Engum testified that there appeared to be some sort of object in the front pocket to the Defendant's hooded

sweatshirt, and that the Defendant appeared to be looking past the officer.  According to Engum, the Defendant's body language caused him great concern, and it  made the hair on the back of his neck stand.

Engum testified that he decided to conduct a pat-down search of the Defendant for his own personal safety.  Engum directed the Defendant to turn towards the rear passenger door of the Expedition, and to place his hands on the vehicle.  The Defendant did not comply with this directive, and Engum placed his hand in the middle of the Defendant's back.  Engum testified that he felt the Defendant's back tense up, and that he told the Defendant to calm down, as he pushed the Defendant forward so that his hands were on the Expedition.  Engum began the pat-down search, at which time he felt a hard object in the Defendant's waistband.  Engum asked the Defendant to identify the hard object, and the Defendant stated that the object was a box of condoms.  According to Engum, the object did not feel like a box of condoms.

Following Engum's inquiry, the Defendant quickly moved to his left, in an attempt to break free from the officer.  Engum grabbed the back of the Defendant's sweatshirt and, after some struggle, Engum was able to bring the Defendant to the ground.  At that point, an officer, who Engum identified as Deputy Winkowski ("Winkowski"), arrived to assist Engum.  Winkowski employed his taser on the

Defendant, which incapacitated the Defendant, and which allowed Engum to place the Defendant in handcuffs.

The Defendant was placed under arrest for interfering with the legal process, and a subsequent search revealed that the hard object in the Defendant's waistband was a handgun. The handgun was loaded, although there was no round in the chamber. The Defendant was placed in Deputy Winkowski's squad car, and he was transported to the Beltrami County Jail. Following the arrest, Engum went into the vehicle, where he observed the barrel of another firearm near the front passenger seat. At this point, or shortly thereafter, the driver of the vehicle was also arrested.

Engum, and an intern who was accompanying Engum, subsequently interviewed the Defendant at the Beltrami County Jail. Prior to the interview, Engum advised the Defendant of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and the Defendant agreed to answer Engum's questions. During the interview, the Defendant admitted that he had concealed a gun in his waistband, and that he was a convicted felon.

The Defendant's Hearing testimony provides a somewhat different account of the events which culminated in his arrest, and the discovery of a handgun in his waistband. According to the Defendant, he and the driver of the Expedition stopped

at a gas station in order to get gas, when he observed Engum's vehicle with its emergency lights activated.  Engum proceeded to ask the vehicle's driver, as well as the Defendant, for their driver's licenses.  When neither was in possession of a driver's license, Engum took their identification cards back to his vehicle, while the driver apparently called his grandmother.  The Defendant testified that Engum did not advise either he, or the driver, why he had stopped the vehicle, even after the Defendant had inquired about the purpose of the stop.

The Defendant also testified that, when Engum asked him if he wanted a ride, he declined Engum's offer, and that he advised Engum that someone was coming to give him a ride.  According to the Defendant, Engum directed him to go stand by the gas station store, but that, after the Defendant exited the vehicle, Engum advised him that he needed to conduct a pat-down search of his person.  The Defendant testified that he initially acceded to the officer's directive to place his hands on the vehicle, but that, as Engum's pat-search approached his waist, he tried to break away and run from the officer.  The Defendant maintains that he ended his resistance immediately after he was taken to the ground.  The Defendant also testified that it was his belief that the vehicle registration sticker, which was in the upper left corner of the rear window, was

visible to Engum, as the window was not heavily tinted, and the area around the gas station was well lit.

There is also some discrepancy about Engum's tone of voice during his interactions with the Defendant and the vehicle's driver. According to the Defendant, Engum used a conversational tone until it became apparent that neither the Defendant, nor the driver, were in possession of a valid driver's license. At that point, the Defendant contends that Engum's demeanor changed, and that he began to use a raised voice. Contrary to that testimony, Engum testified that he used a conversational tone throughout the entirety of the encounter.

## III.  Discussion

The Defendant's Motions seek to suppress evidence that was acquired as a result of the traffic stop, and subsequent pat-down search, as well as statements that were made following his arrest. The testimony that was adduced from Engum, and the Defendant, provides varying accounts of the facts which are pertinent to the Motions, and as a result, an unavoidable credibility determination heavily influences the result we reach. In assessing the believability of Engum and the Defendant, we have weighed their demeanor, and the consistency of their testimony with both common sense, and with the Record as a whole. We are persuaded that Engum is the

more believable witness. He deported himself well as a witness, responded directly, and forthrightly, to the questions asked, and he appeared to have a proper appreciation for the law which governs the seizure of persons suspected of criminal activity. Furthermore, the Defendant has not drawn anything to our attention so as to suggest that Engum has any past record of falsification, dishonesty, or perjury.

On the other hand, we are not persuaded that the Defendant is fully believable. Notably, as is demonstrated by the Indictment in this matter, a Grand Jury has found probable cause to believe that the Defendant has engaged in significant criminal activity, in the recent past and, if convicted on the pending charge, the Defendant would face a potentially lengthy sentence which, in itself, creates an incentive for him to provide less than candid testimony. Furthermore, the Defendant acknowledged, at the Hearing, that he did not make any contemporaneous recording, written or otherwise, of the events to which he testified, which occurred more than two (2) months prior to the Hearing. Therefore, to the extent that the testimony of the Defendant and of Engum is inconsistent, we credit the testimony of Engum. With this in mind, we turn to the Defendant's Motions.

A.    The Defendant's Motion to Suppress Evidence of Search.

The Defendant's Motion is predicated on his position that there was no reasonable suspicion to justify the traffic stop of the Expedition, and that the subsequent pat-down search of his person was also conducted without reasonable suspicion, or consent.  Since our determination of the lawfulness of the traffic stop, and the lawfulness of the subsequent pat-down search, involve different considerations, each will be addressed separately.

1.    The Traffic Stop.

a.    Standard of Review.  The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  United States Constitution, Amendment IV.  A roadside traffic stop "is well established" as a "'seizure' within the meaning of the Fourth Amendment."  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001), quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979); see also, United States v. Martinez-Fuerte, 428 U.S. 543, 556-558 (1976); United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).  An essential purpose behind the Fourth Amendment's proscriptions is to impose standards of reasonableness upon the exercise of law enforcement's discretionary powers, so as to safeguard an individual's

- 12 -

privacy from arbitrary invasion by the Government.  See, <u>Delaware v. Prouse</u>, supra at 653-54; <u>Marshall v. Barlow's Inc.</u>, 436 U.S. 307, 312 (1978); <u>Camara v. Municipal Court</u>, 387 U.S. 523, 528 (1967).  Thus, whether a certain action is permissible, under the Fourth Amendment, "is judged by balancing [that action's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  <u>Id.</u> at 654.

In considering the extent to which a traffic stop intrudes upon an individual's Fourth Amendment interests, the Supreme Court has held that traffic stops are investigative detentions, not custodial detentions, and therefore, the principles of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), govern the analysis as to the reasonableness of the stop.  <u>United States v. Jones</u>, supra at 925, citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984); see also, <u>Delaware v. Prouse</u>, supra at 663.  As a consequence, the Supreme Court has instructed that, prior to making a traffic stop, a law enforcement officer must have "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations -- or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered."  <u>Delaware v. Prouse</u>, at 661.

- 13 -

However, "[i]t is well established that a traffic violation -- however minor -- creates probable cause to stop the driver of a vehicle." United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004), quoting United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996), quoting, in turn, United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993). Accordingly, "a police officer who personally observes a traffic violation has probable cause to stop the vehicle and offending driver." United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 646 (8th Cir. 1999), citing Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977).

"This is true even if a valid traffic stop is a pretext for other investigation." United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002), citing Whren v. United States, 517 U.S. 806, 812-13 (1996). Simply put, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause * * * * [t]hat is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004). As the Supreme Court has repeatedly explained, "'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'"

- 14 -

Id., quoting Whren v. United States, supra at 815; see also, United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995)("So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant.").

Moreover, there is no requirement that there be a traffic violation, so long as the police officer has a reasonable suspicion that the vehicle, or its occupants, are involved in criminal activity. See, United States v. Mora-Higuera, 269 F.3d 905, 909 (8th Cir. 2001), citing Alabama v. White, 496 U.S. 325 (1990). "Reasonable suspicion requires '"a particularized and objective basis" for suspecting the person stopped of criminal activity,'" which is not as demanding a standard as a showing of probable cause. Thomas v. Dickel, 213 F.3d 1023, 1025 (8th Cir. 2000), quoting Ornelas v. United States, 517 U.S. 690 (1996), quoting in turn, United States v. Cortez, 449 U.S. 411, 417 (1981); and citing, United States v. Sokolow, 490 U.S. 1 (1989).

b. Legal Analysis. Here, Engum effected a traffic stop of the vehicle in which the Defendant was a passenger after he observed that no license plate was displayed on the rear of the vehicle and, from the officer's vantage point, a temporary registration sticker was not visible in the left rear window of the vehicle. Since the absence of such displays is a violation of Minnesota law, see, Minnesota

Statutes <u>Sections 169.79, Subdivision 6, and 168.092, Subdivision 1</u>, Engum was fully

justified in effecting the traffic stop of the Expedition.  See, <u>United States v. Bueno</u>,

443 F.3d 1017, 1024-25 (8th Cir. 2006)(traffic stop was supported by reasonable

suspicion where the stopped vehicle did not have a front licence plate, the officers did

not see the temporary registration sticker until after the stop, and the lack of license

plates or a temporary registration would have constituted a violation of State law);

<u>United States v. Gaxiola</u>, 149 Fed. Appx. 560, 561-62 (8th Cir., October 5, 2005)

(failure to display front license plates justified traffic stop).

 Since the traffic stop was lawful, Engum was entitled to conduct a reasonable

investigation into the unlawful activity that justified the stop.   "A reasonable

investigation includes asking for the driver's license, registration, as well as inquiring

about the occupants' destination, route, and purpose."  <u>United States v. Sanchez</u>, 417

F.3d 971, 975 (8th Cir. 2005), quoting <u>United States v. Munroe</u>, 143 F.3d 1113, 1116

(1998); see, <u>United States v. Gaxiola</u>, supra at 561.   Therefore, Engum was also

justified in requesting to see the driver's license of the driver of the vehicle.  Since the

driver was only able to produce an instructional permit, Engum's inquiry as to

whether the Defendant was a licensed driver was also permissible, as such an inquiry

was necessary to determine whether the driver's operation of the vehicle was

unlawful, or whether either of the vehicle's occupants were authorized to operate a motor vehicle. See, <u>Minnesota Statutes Section 171.02, Subdivision 1</u> ("Except when expressly exempted, a person shall not drive a motor vehicle upon a street or highway in this state unless the person has a license valid under this chapter for the type or class of vehicle being driven.").

Once Engum determined that neither the driver, nor the Defendant, were licensed drivers, he followed an appropriate protocol, which required that the Expedition be towed. See, <u>United States v. Betterton</u>, 417 F.3d 826, 830 (8th Cir. 2005)("[N]othing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory."), quoting, <u>United States v. Agofsky</u>, 20 F.3d 866, 873 (8th Cir. 1994). Furthermore, under the circumstances of the lawful stop, Engum's conduct, in asking the driver and the Defendant to exit the vehicle, since they could not remain inside of the vehicle while it was being towed, was also reasonable. See, <u>Maryland v. Wilson</u>, 519 U.S. 408, 415 (1997)(holding that officer effecting a traffic stop may lawfully order a passenger to exit a vehicle pending the completion of the stop); see also, <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 108-112 (1977). Therefore, we find no constitutional infirmity in any of Engum's conduct that preceded the pat-down search.

2.     The Pat-Down Search.

a.     Standard of Review.  "When a police officer reasonably believes that a person may be armed and dangerous, the officer may frisk that person for weapons."  United States v. Garcia, 441 F.3d 596, 599 (8th Cir. 2006), citing United States v. Cornellius, 391 F.3d 965, 967 (8th Cir. 2004).  Reasonable suspicion, in this context "is not a "finely-tuned" or bright-line standard; each case involving a determination of reasonable suspicion must be decided on its own facts."  United States v. Roggeman, 279 F.3d 573, 579 (8th Cir. 2002).  As our Court of Appeals recently explained:

> In determining whether an investigating officer had the requisite "reasonable suspicion" for a protective frisk, we are not guided by a "neat set of legal rules."  Ornelas v. United States, 517 U.S. 690, 695-96, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)(internal quotations omitted).  Rather, we must examine the "totality of the circumstances" in every case to see if the officer conducting the search had a "particularized and objective basis for suspecting legal wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).  This analysis looks at such facts as the "time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence."  United States v. Dawdy, 46 F.3d 1427, 1429 (8th Cir. 1995).  Also relevant are those inferences and deductions made by officers under the particular circumstances, since law enforcement officers are "trained to cull significance from behavior that would appear innocent to the untrained observer."  United States

> v. Poitier, 818 F.2d 679, 683 (8th Cir. 1987).   While
> reasonable suspicion is a "less demanding standard than
> probable cause and requires a showing considerably less
> than a preponderance of the evidence, Illinois v. Wardlow,
> 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000),
> an officer may not rest on "inchoate and unparticularized
> suspicion or 'hunch,'" Terry, 392 U.S. at 27, 88 S.Ct. 1868.

United States v. Bailey, 417 F.3d 873, 876-77 (8th Cir. 2005), cert. denied --- U.S. ---,
126 S.Ct. 1894 (2006).

"Although the officer need not actually fear that the individual is armed and

dangerous, the facts must be such that 'a hypothetical officer in exactly the same

circumstances' reasonably could believe that the individual is armed and dangerous."

United States v. Hanlon, 401 F.3d 926, 929 (8th Cir.2005).  "Because safety is the sole

justification for a pat-down search for weapons, only searches 'reasonably designed

to discover weapons' are permissible."   Id., at 930, quoting United States v.

Roggeman, supra at 577.

"In examining the relevant facts and inferences, we must keep in mind that

'minimally intrusive weapons searches' at traffic stops will more likely be reasonable

because of the 'inherent danger' of traffic stops."   United States v. Schranklen, 315

F.3d 959, 962 (8th Cir. 2003), cert. denied sub nom., Fleming v. United States, 538

U.S. 971 (2003), citing United States v. Menard, 95 F.3d 9, 11 (8th Cir. 1996).

Furthermore, the United States Supreme Court has observed that "danger to an officer

from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." <u>Maryland v. Wilson</u>, supra at 414.

b.    <u>Legal Analysis</u>.  Here, several circumstances were present which, to a trained officer, might have suggested that the Defendant was armed and dangerous.  Specifically, the pat-down search was conducted during the course of a traffic stop, see, <u>United States v. Menard</u>, supra at 11 ("The Supreme Court has frequently noted the inherent danger traffic stops pose to police officers and the consequent likelihood that minimally intrusive weapons searches will be reasonable."); it occurred late at night, see, <u>United States v. Bailey</u>, supra at 877 (fact that encounter occurred at 1:00 o'clock a.m. was relevant to the officer's reasonable belief that suspect was armed and dangerous); the vehicle had failed to stop upon Engum's activation of his emergency lights, see, <u>United States v. Tate</u>, 34 Fed. Appx. 502, 505 (8th Cir. 2002)(considering evasive actions taken by the driver of a vehicle in response to the officer's attempts to stop the vehicle, in determining presence of reasonable suspicion); when Engum had approached the Expedition, the driver had thrown his keys onto the roof of the vehicle which, according to Engum, was highly unusual; the hands of the vehicle's driver were visibly shaking, and the Defendant appeared to be avoiding all eye contact with Engum, see, <u>United States v. Robinson</u>,

119 F.3d 663, 667 (8th Cir. 1995)(considering motorist's nervous appearance and refusal to make eye contact with the officer in determining the presence of reasonable suspicion); neither of the vehicle's occupants were in possession of a valid driver's license, see, United States v. Garcia, supra at 599 (act of driving without a license was a pertinent consideration of whether reasonable suspicion was present to believe that the driver was armed and dangerous); the Defendant was fidgeting with the front pocket of his hooded sweatshirt, which appeared to be concealing something; and the Defendant's body language was such that it made the hair on the back of Engum's neck stand.  See, United States v. Davis, 202 F.3d 1060, 1063 (8th Cir. 2000), cert. denied, 531 U.S. 883 (2000)(unusual movements of individual during the course of a pat-down search of a companion provided reasonable suspicion to conduct a pat-down search).  Therefore, considering the totality of the circumstances, we find that reasonable suspicion was present to believe that the Defendant may have been armed and dangerous, and that Engum was justified in subjecting the Defendant to a pat-down search.

In sum, since we find that the traffic stop was supported by reasonable suspicion of a traffic violation, and that, at the time of the pat-down search, reasonable

suspicion was present to believe that the Defendant was armed and dangerous, we recommend that the Defendant's Motion to Suppress Evidence of Search be denied.

B.      The Defendant's Motion to Suppress Statements.

The Defendant has conceded that he was advised of his <u>Miranda</u> rights, prior to the statements at issue, and that he waived those rights.  Rather, the Defendant's Motion is predicated entirely upon his assertion that his statements were the fruit of Fourth Amendment violations, which occurred during the traffic stop, and the subsequent search of his person, and which ultimately resulted in the Defendant's arrest.  For the reasons set forth above, we have found no Fourth Amendment violations in either the traffic stop or the pat-down search.  Therefore, we recommend that the Defendant's Motion to Suppress Statements also be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Defendant's Motion to Suppress Evidence of Search [Docket No. 11] be denied.

2.    That the Defendant's Motion to Suppress Statements [Docket No. 12] be denied.


Dated:  June 5, 2006                         s/Raymond L. Erickson
                                             Raymond L. Erickson
                                             CHIEF U.S. MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 22, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 22, 2006**, unless all interested parties

stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the

transcript in order to resolve all of the objections made.